<hr />

(18 App. Div. 340.)

## SMITH v. CITY OF BROOKLYN.

(Supreme Court, Appellate Division, Second Department. June 22, 1897.)

1. WATER RIGHTS—DESTROYING STREAM—PERCOLATING WATERS.
    The right of an owner of land to divert or consume percolating water does not extend to authorizing the destruction of a stream, spring, or well, by cutting off its source of supply, when the acts causing such result are not done for the beneficial use and enjoyment for any purpose of the land itself whereon they are done, but for the sole purpose of gathering water, by pumps as well as by natural means, to be carried to a distant place for the use of strangers having no right to the water as against the owners of the neighboring lands.

2. SAME—MUNICIPAL CORPORATIONS—WATER SUPPLY.
    Plaintiff was the owner of land through which ran a brook, flowing at all seasons in a defined channel, and by damming which a pond had been formed, which was used by plaintiff for cutting ice and for boat building.

Defendant, a municipal corporation, for the purpose of procuring a water
supply, constructed, on land owned by it near plaintiff's, a reservoir and
aqueduct, sank wells, and erected powerful suction pumps, by all which the
spring line in the vicinity was lowered, the sources of supply to the stream
flowing through plaintiff's land were cut off, and the stream was dried up.
*Held,* that plaintiff was entitled to recover from defendant the damage he
had suffered.

Appeal from trial term.

Action by Walter R. Smith against the city of Brooklyn.   From a
judgment entered on a decision of the court dismissing the complaint,
plaintiff appeals.   Reversed.

Argued before GOODRICH, P. J., and .CULLEN, BARTLETT,
HATCH, and BRADLEY, JJ.

George Wallace, for appellant.
William G. Cooke, for respondent.

HATCH, J.   For the purpose of furnishing the city of Brooklyn
with a water supply, the defendant constructed upon its lands in the
county of Queens a reservoir, aqueduct, and culverts, or conduits, for
holding and carrying the water.   In the process of construction of
these works, it excavated a trench, which, at Freeport, upon the line,
was about 27 feet below the surface of the ground, in which it placed
a box for carrying the water during the construction of the works,
and to operate as a conduit for the same thereafter.   It also sunk a
number of wells, and connected them with powerful steam suction
pumps.   Pumping stations were constructed, and from the one at the
west end of the conduit the average daily quantity of water taken in
1895 was 36,421,147 United States gallons.   The amount withdrawn
increases at about the rate of 6,000,000 gallons daily.   The plaintiff
is the occupant of a farm situate near Freeport, upon which, when he
entered into possession, was a stream of water, running in a well-
defined channel, fed by springs and from other sources.   The brook,
many years ago, had been dammed, forming a pond.   Brook and pond
had been in existence for over 50 years, and water remained in both
the year around.   Plaintiff used the pond for boat building and secur-
ing ice.   For the latter purpose it was of considerable value.   The
pond was distant from the aqueduct about 2,400 feet.   The bottom
of the conduit is 16.8 feet below the bottom of the pond.   The soil
in the locality of these waterworks and of the surrounding country is
of a sandy or gravelly nature, through which water readily percolates.
There began to be failure in the water of the brook and pond shortly
after the work of construction began, and perceptibly so after the
conduit trench was opened and the box put in.   Both disappeared
entirely upon the erection and operation of the pumping station at
Freeport, and have remained dry ever since.   The evidence is abun-
dant to warrant a jury in finding that the disappearance of the brook
and pond is due to the draining of the territory where plaintiff's farm
is situate, and is caused by the conduit and wells of the defendant, in
connection with the suction power applied thereto.   The defendant
does not seriously controvert the claim made by the plaintiff, that its
acts have had the effect of lowering the hydraulic grade or spring line

in that vicinity, resulting in the loss of the brook and pond, and in the destruction of wells throughout a considerable area of country in that locality. While this result is not challenged by the defendant, its liability therefor is denied. The ground upon which the defendant thus confidently plants itself has been discussed by most of the courts in nearly every state of the Union. The English Reports are likewise prolific in decision, if not in harmony of reason and conclusion. The defendant has adopted in support of its contention the language of Judge Peckham in Pixley v. Clark, 35 N. Y. 520, where the learned judge says:

"An owner of the soil may divert percolating water, consume, or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of the land is the absolute owner of the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with or destroying percolating or circulating water under the earth's surface."

This doctrine cannot be questioned, although it was obiter to the decision. In this respect it is in harmony with many of the discussions which have been had of the subject. The decisions of this state, ancient and modern, are committed to this view of the law, including this tribunal. Ellis v. Duncan, 21 Barb. 230; Bloodgood v. Ayres, 108 N. Y. 400, 15 N. E. 433; Van Wycklen v. City of Brooklyn, 118 N. Y. 427, 24 N. E. 179; Covert v. City of Brooklyn, 6 App. Div. 73, 39 N. Y. Supp. 744. Admitting this doctrine, to the extent to which these and other authorities in this state carry it, does it fit to the facts of the present case? It may be stated, with some degree of confidence, that no case will be found in this state—and our research has not enabled us to find one in any other state of this country—where the right has been upheld in the owner of land to destroy a stream, a spring, or well upon his neighbor's land, by cutting off the source of its supply, except it was done in the exercise of a legal right to improve the land, or make some use of the same in connection with the enjoyment of the land itself, for purposes of domestic use, agriculture, or mining, or by structures for business carried on upon the premises. We are aware that the doctrine has been carried beyond this in England, but it has not yet been judicially declared here. Chasemore v. Richards, 7 H. L. Cas. 349. The present case, as we view it, differs radically from any reported case that we are able to find in this country. While it is true that the city owned the land upon which it placed its structure, and all of its acts were done upon its own property, it did not, however, make the erections or do the acts for the beneficial use and enjoyment of the land itself for any purpose of domestic use, agriculture, mining, or manufacturing, as land was used in the cases which have arisen in this country. No one dwelt thereon, or was expected to. No one used the water thereon, nor was it expected to be used in connection therewith. The sole purpose was to subordinate the use of the land to the particular purpose of a reservoir and conduit in which to gather, store, and carry water to a distant place for its benefit and profit, and for the enjoyment of strangers who have no claim or shadow of right to it as against the plaintiff. It was its purpose not only to take the water which might come by natural

percolation upon its land, but also to use artificial means, and by powerful suction drain the adjoining land of its water. This purpose has been accomplished, and by the construction of its conduit, the sinking of its wells, and the suction of its powerful pumps, the whole spring level of the surrounding country has been lowered, and running streams and ponds dried up. In view of these facts, let us examine the principle which underlies the right to percolating water, and the reasons upon which it rests. It is not necessary that we should set them out herein at length, for they have been admirably stated, and the cases reviewed, from the leading case of Acton v. Blundell, 12 Mees. & W. 324, decided in the exchequer court of England by Chief Justice Tindel, to the modern decisions in this country, in two cases,—one in Pennsylvania (Wheatley v. Baugh, 25 Pa. St. 528), and in Ohio (Frazier v. Brown, 12 Ohio St. 294). In the last case the learned judge who wrote stated the principle and the reasons therefor in the following language:

"The reasoning is briefly this: In the absence of express contract and of positive authorized legislation, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters oercolating, oozing, or filtrating through the earth; and this mainly from considerations of public policy: (1) Because the existence, origin, movement, and course of such waters, and the causes which govern and direct their movements, are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would be therefore practically impossible. (2) Because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth; with drainage and agriculture, mining, the construction of highways and railroads; with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility."

It seems clear from the reasoning of these cases that the right which exists and which has been upheld relates to the beneficial use of the land for some purpose for which the land can be used, connected with its enjoyment as land for the ordinary purposes of agriculture, mining, domestic use, or improvement, either public or private. In New Hampshire this view, even, has never obtained. The courts of that state have ably maintained the doctrine of correlative rights and obligations between owners of land respecting the right to take and use percolating water; holding that the authority to take rests upon the right of reasonable use; applying thereto the maxim, 'Sic utere tuo ut alienum non lædas" (Bassett v. Manufacturing Co., 43 N. H. 569; Swett v. Cutts, 50 N. H. 445), which is also the doctrine contended for by Lord Wensleydale, to be hereafter noticed. This maxim has been rejected by our courts as applied to the right of use by a landowner of his land for the purposes already adverted to. But the reasoning of the cases is quite convincing against an extension of the doctrine beyond its present limit. It needed no occult power to foresee that the construction of these waterworks would drain a large part of the territory contiguous thereto, and seriously diminish the water supply of adjoining owners. The conduit was constructed lower than the surrounding territory, the soil was of a character which admitted of ready percolation of water, and the object of the construction was to secure water. This was not an experiment. It was known that, if the proper ex-

cavations were made, channels created for water to run in, wells sunk, and suction applied, the result would be to draw water to that construction. It is true that one might not be able to see just where the subterranean channel existed through which the water percolated, or how much water was retained in any particular pocket or fissure. Nevertheless it was known, as well as though seen, that, if these means were adopted, the result would be to draw the water to that place from the adjoining lands and streams as certainly as though the open mouth of the conduit tapped a running stream and took it all. It is quite probable, also, that the drain will continually increase. Powerful suction drawing the water in one direction necessarily creates channels. By the continuous running of the water therein, its action wears away barriers, and changes the formation which formerly held it, letting it run quicker and in increased quantities to the common goal. We may speculate much or little upon the question of where the property right begins in water that descends from the heavens,—whether it could be legally caught by roofs and stored before entering the ground, or whether it must be permitted to fall and enter the earth. Such questions will be disposed of, undoubtedly, as they arise. We have the fact, admitted by all legal writers, that a property right exists in percolating water of as high a character as the land itself,—is in fact a part of the land. It is a valuable right, and its use is usually indispensable to the enjoyment of the land wherein it is found. This right is only qualified by the equal right of every adjoining landowner. The right of use is supported in either when, for purposes of use upon the land, or of the land, injury results to one as an incident to such use. But it seems to me monstrous to assert that one landowner may deliberately and intentionally make an erection for the express purpose of draining the land of another of its percolating water, and thereby destroy streams, springs, ponds, and wells, and be supported in so doing upon the theory that it is the exercise of a legal right in the use of his land. An adjoining owner has no right to tunnel into another's land for water or minerals, or take away soil lying under the surface. But, if this doctrine is to be supported, he may erect upon his own land an appliance which will draw out all the water, which would otherwise remain, without liability; and, if water, why not the minerals and the soil? So far as property right is concerned, one is as much land as the other. The reason upon which the right has been supported to divert percolating water fails when applied to such conditions, as such right is limited to such water as naturally flows upon the land, and not to a flow artificially created. "So use your own property as not to injure another" is a maxim as old as civilized man, and binding both in law and morals. It may be saved and applied to percolating water, and still support our prior decisions, by placing the limitations upon it which reason and justice suggest.

There remains to be considered another feature of the question raised by the record now before us. The stream which was diverted and which formed the pond was perennial. The witnesses say it had existed for 50 years, to their knowledge, and, if 50 years, prob-

ably always, as streams have existed. It was fed by springs. The act of the defendant has cut off the feeders, and it no longer lives. The right to use of a running stream is not rested upon a grant. It is jura naturæ. We need not discuss the rights of riparian owners in running streams, as that question is well settled. Among the rights thus established is that water may not be diverted from a running stream to the damage of a riparian owner. In the case of water already in the stream, this right is clear, and we have no difficulty. But just here arises the trouble in this case. The water had not arrived at the stream. Its destruction was complete, as its source of life was cut off. We are therefore to consider whether the property right of plaintiff is in the thing, the stream, or in the particles of water, simply, which presently go to make it up. The struggle to maintain the principle of law applicable to percolating water, as applied to the diminution of running streams, in its application to a state of facts similar to those which now confront us, has been a source of much trouble and difficulty for the English courts. Pollock, C. B., in the case of Dickinson v. Canal Co., 7 Exch. 282, held that, where water had been taken from a running stream by the sinking of a well, it was an unlawful diversion of the water, for which the canal company was liable. In that case the water was abstracted both before and after it had reached the stream. The case was condemned by the house of lords in Chasemore v. Richards, 7 H. L. Cas. 349. This case was quite similar in its facts to the present,—sufficiently so as to make its principles applicable. The ground of the decision was based upon the rule applied to percolating water as laid down in Acton v. Blundell, supra, and for reasons stated in the opinion of the judges furnished to the lords. In discussing the question, Lord Wensleydale said:

"It has been now settled that the right to the enjoyment of a natural stream of water on the surface, ex jure naturæ, belongs to the proprietor of the adjoining lands, as a natural incident to the right to the soil itself, and that he is entitled to the benefit of it, as he is to all the other natural advantages belonging to the land of which he is the owner. He has the right to have it come to him in its natural state, in flow, quantity, and quality, and to go from him without obstruction. * * * If the river Wandle in this case had been supplied by natural streams flowing into the river above ground, or in known definite channels below ground, the cutting off those streams to which the person entitled to the use of the river was entitled ex natura, as feeders of the river, would be an injury to him, and give a right of action. And, if this be true with underground streams finding their way into the river, then comes the difficulty how to distinguish the smaller rivulets, and the drops of water which flow and percolate into and supply the river. They are all equally the gifts of nature for the benefit of the proprietors of the soil through and into which they flow. They are all flowing water, the property in which is not vested in the owner of the soil, any more than the property in the water of a river which flows through it on the surface."

The conclusion reached by this opinion resolved itself into the inquiry whether the right which took the water was exercised in a reasonable manner. Indeed, the argument of the learned lord carried him to a decision which fastened liability upon the defendant, but he voted the other way. There are other English cases decided upon the same reasons which prevailed in that case, but they are all

reviewed in the Chasemore Case, and it is not necessary to restate their views here. The state of the law in England would be clearly regarded as settled by the last decision, which was rendered in 1859, were it not for another decision, rendered in 1871. Canal Co. v. Shugar, 6 Ch. App. 483. This was an action for an injunction restraining the defendant from diverting the water of certain springs running in a pond, which were cut off by a drain. Lord Hatherly, in delivering the opinion, said:

"Now, as regards the law of the case, I should think it beyond dispute, after Chasemore v. Richards. Mr. Justice Wightman there laid down the law very plainly, in giving the opinions of the judges upon the subject, and the distinction was there drawn, and, I should have thought, fairly established, between water which comes no one knows exactly whence, and flows no one knows exactly how, either underground or on the surface, unconfined in any channel, either as rainfall, or from springs of the earth, which may vary from day to day, or spring up from beneath the surface in a direction which no one knows,—between that species of water and water once confined in a regular channel. When I say 'once,' of course I mean for such period of time as that there can be no difficulty raised with reference to the rights of the parties. * * * I do not think Chasemore v. Richards, or any other case, has decided more than this: that you have a right to all the water which you can draw from the different sources which may percolate under ground. But that has no bearing at all on what you may do with regard to water which is in a defined channel, and which you are not to touch. If you cannot get at the underground water without touching the water in a defined surface channel, I think you cannot get at it at all. You are not, by your operations, or by any act of yours, to diminish the water which runs in this defined channel, because that is not for yourself, but for your neighbors also, who have a clear right to use it, and have it come to them unimpaired in quality and undiminished in quantity."

In view of the fact that the action in Chasemore v. Richards was for the recovery of damages for the diversion of water which supplied the river Wandle, and that Mr. Justice Wightman said of such claim that the right was "so indefinite and unlimited that, unsupported as it is by any weight of authority, we do not think it can be well founded, or that the present action is maintainable," we feel justified in observing that the two cases cannot stand together, even though it be judicially said that they do. One might as well attempt to reconcile Malone v. Hathaway, 64 N. Y. 5, with Kranz v. Railroad Co., 123 N. Y. 1, 25 N. E. 206. The question here, however, is not of reconciliation. Our search is for the better reason. There is certainly an inconsistency in the rule which gives to an owner of land the usufruct of a stream which exists as a right ex natura, and yet vests in another, in his search after underground water, the right to destroy the stream absolutely. There is no difference in the injury inflicted, if the stream be taken, whether it be brought about by drawing the water from the stream itself, or cutting off the supply. The right is to have the water for purposes of use in any lawful manner which the owner of the soil sees fit. He may erect an expensive plant upon the bank, and depend upon the stream for carrying on the business which he conducts; and, unless he have some measure of protection, an adjoining owner may utterly destroy his right by cutting off the source of the stream. The right to a running stream is a fixed, definite right, —more secure than that of percolating water, as the one is visible and open, the other obscure and uncertain. This right is to receive

the water, and have it continually flow therein. It cannot be so enjoyed if the only right therein be to the present particles of water. We think it is not so limited, that the right is in and to the stream as a distinct entity, and that, where its source is known and its channel defined, an adjoining owner has ordinarily no right to so use his property as to work a destruction of the stream. We think that the reasoning of Lord Wensleydale in the Chasemore Case, and by Baron Pollock in the Dickinson Case, and the limitation placed upon the Chasemore Case by Lord Hatherly, furnish the rule which more nearly corresponds to the rights of adjoining landowners in respect to running streams. So far as this question is concerned, it brings the view to rest upon the maxim, "Sic utere tuo ut alienum non lædas," and we think it applicable to running streams, with defined courses, whose existence is from time immemorial. The doctrine of the Shugar Case is favorably commented upon in Aetna Mills v. Inhabitants of Brookline, 127 Mass. 69, 71. The case, however, was disposed of upon another ground. We infer that the court of appeals is impressed with this view by reason of the observation made by Andrews, C. J., in Covert v. Cranford, 141 N. Y. 521, 36 N. E. 591. The same principle is decided by Mr. Justice Story in Dexter v. Aqueduct Co., 1 Story, 387, Fed. Cas. No. 3,864. This decision was upon principle, as well as the discredited authority cited. It is not, however, necessary for us in this case to lay down any fixed rule. Indeed, it must at all times depend upon the particular facts of the particular case as applied to the doctrine of reasonable use and relative rights. It is sufficient now to say that the act of the defendant, under the facts of this case, is not sanctioned by any of the authorities in this state, or by any sound rule of law. The plaintiff made a case which entitled him to recover such damages as he has sustained, and it was error to dismiss his complaint.

The judgment should be reversed, and a new trial granted, with costs to abide the event. All concur.