Nicholas Pette, J.
This action was brought to recover $6,000 damages to plaintiffs’ real property, alleged to have been caused *88 by defendant’s interference with the source of a stream of water which for many years flowed through plaintiffs’ land. It is alleged in plaintiffs’ complaint that defendant caused the stream to dry up by installing a powerful pump in a well on its property and connecting this well with its distribution system. Defendant’s answer denies the allegation and pleads a separate defense that it is a public utility, that its authorization by the State to include this well in its distribution system was conditioned upon its stopping an existing overflow, and that in compliance with "this directive which was legally binding upon it, it cut off the surface discharge from its well.
Since 1924 plaintiffs have owned 2.13 acres of land at the northwest corner of Viola Road and Forshay Road in the Town of Ramapo, improved with a 7-room frame house in which they live, and a large barn. The plot has a frontage of about 185 feet on Viola Road and about 500 feet on Forshay Road. A watercourse originating on defendant’s land runs north, crosses under Viola Road in a culvert, then enters plaintiffs’ land and continues through,the full length of plaintiffs’ property. The distance from defendant’.s well to the southerly line of plaintiffs’ property was estimated variously by witnesses testifying at the trial to be from 1,000 feet to 1,400 feet.
Plaintiff Edward Stevens testified that about 50 feet north of defendant’s well there is a small pond which contains a spring; north of the pond there is a swamp extending several hundred feet, and throughout this swamp there are, or used to be, many small springs. The brook flowed from the pond, through the swamp, then north to Viola Road. The overflow from the pond and water from the springs in the swamp fed the brook. He saiid that in 1924 this brook on his property was a constantly flowing stream of fresh, clean water, 4 to 5 feet wide and 4 to 6 inches deep. He remembered observing this stream flowing in the same way as early as 1910, and one of his witnesses testified that it was flowing there in the same way in 1892. The stream dried up in 1959, after defendant had connected its well with its distribution system, and it has remained dry since, except that during the Spring months and after heavy rains it carries away some surface runoff.
The land on which defendant’s well is situated belonged at one time to Rocklalnd County. The county had the well drilled in 1939 to supply, water to the County Welfare Home, then situated on the opposite side of the road now known as College Road. Defendant’s witnesses testified that this well is 232 feet deep and that before it was connected to defendant’s distribution system there was a constant overflow from it, estimated by *89 one of defendant’s engineers to be about 80 gallons per minute. This overflow ran into the pond, and thence into the brook, until it was cut off by defendant in 1959.
After running tests in 1956 with temporary equipment, defendant purchased the well and 10 acres of surrounding land from the county in 1957. It then ‘ ‘ rehabilitated ’ ’ the well in 1959. Defendant’s chief engineer testified that the permanent pump now in use there is a centrifugal multistage pump driven by a 75-horsepower motor. This witness also testified that in his opinion the overflow from the well had been the primary source of the water in the brook. In answer to questions by the court as to the source of the water in the brook before the well was . drilled in 1939, he said that it could only have been surface runoff.
A neighbor called as a witness by the plaintiffs testified that he had lived in this vicinity since 1941, and had a well on his property, about 50 feet deep, and situated approximately 1,000 feet away from defendant’s well. He said that the water level in his well had fallen so much after defendant started pumping from its well in 1959, that he could no longer use his well. Records of measurements of water in his well, and of other observations made by this witness, were received in evidence subject to connection.
A professional sanitary engineer testified as an expert on behalf of plaintiffs that he had examined the stream and the surrounding area in May, 1962 and that at that time the stream was 4 feet wide and one-half inch deep where it flowed under Viola Road. He explained how streams are formed from the precipitation which falls on a certain area called a ‘£ catchment area”. Some of this water drains into the stream as surface runoff, and some of it, after percolating into the ground and reaching the water table therein, eventually seeps out and emerges as springs at a place where the water table intersects the surface of the ground. It is this ground water that feeds a stream in dry weather. This witness testified also that the water level in the neighbor’s well was of significance as far as the stream was concerned, that it reflected the operation of defendant’s well. In answer to a hypothetical question embodying the facts already testified to, he said it was his opinion that the operation of defendant’s well had caused the stream to dry up.
A real estate broker testified on behalf of plaintiffs that he had inspected their property on May 21, 1962 and again on October 7,1962 and on both occasions had observed the dried-up watercourse running through it. He said that this property is *90 situated in an area of steadily rising values, one that is changing from farm and orchard lands to a community of single-family homes; that the area is zoned for private dwellings; and that in his opinion the value of plaintiffs’ land and buildings with the flowing stream would be $34,440, and without it $28,440; that the value of the land alone, with the stream, would be $12,390, and without it $6,390; that although plaintiffs had made no use of the stream in 1959 before it dried up, a stream of clean water 4 feet wide and 6 inches deep would add $6,000 to the value of the land.
Defendant contended on the trial that there are two water tables in the ground in the vicinity of its well, one above an impervious layer called an “ overburden ”, and another underneath this impervious layer; that no water from the lower water table ever fed the stream, and that the pumping of water from its deep well could not possibly have had any effect on the water table above the impervious layer. Engineers employed by defendant testified that defendant’s well is a ££ rock well” consisting of a steel pipe 10 inches in diameter sunk through the ££ overburden ” to bedrock and then drilled the rest of the way through the rock. Its total depth is 232 feet, but these witnesses did not know the depth or composition of the overburden inasmuch as defendant had not drilled the well and did not have access to the driller’s log. Although these witnesses admitted that pumping from defendant’s well would cause a £ £ zone of depression ’ ’ and a drop down of the water table in the ground below the overburden, they said this pumping could not have affected the flow of water into the stream. Defendant’s chief engineer did ¡admit, however, that the operation of defendant’s well might have had some effect on the neighbor’s well.
A ground-water geologist testified as an expert for defendant that the fact that defendant’s well had overflowed steadily before being capped showed that it was an artesian well; that the water in an artesian well has flowed under an impenetrable layer from some distant source, and this water exerts an upward pressure against the impenetrable layer above it. When this layer is pierced by a well the pressure causes the water to rise in the well and flow without pumping. He testified further that none of the water In defendant’s deep well had percolated down from the surface near the well, because water could not pass through the impenetrable overburden; that although he did not know the composition of the overburden it had to exist there because this well was artesian; that “ that is factual. That is as axiomatic as the law of gravity.” This witness admitted that percolating ground water above the overburden had contributed *91 to the feeding of the stream, but said that “ substantially none ” of the percolating water below the impermeable layer did so, and that the pumping of defendant’s well had not caused the stream to dry up. He admitted that it is possible that the pumping of defendant’s well had affected the neighbor’s well, but maintained that it had had no effect on the ‘‘ shallow overburden water ”. He testified further that the fact that the water pumped from defendant’s well was taken away and distributed elsewhere had no effect on the recharging of the well. This, he said, would come from rain and snowfall.
Two real estate experts who were familiar with this neighborhood for many years and who had made many appraisals in the vicinity for banks, government agencies, and private corporations, including defendant, testified on behalf of defendant that the stream was of no value to plaintiffs; that a stream of clean water 4 to 5 feet wide and 6 inches deep would neither add to nor detract from the value of plaintiffs’ land; that it had no monetary significance at all. On cross-examination one of these experts testified that the stream might even be detrimental if the land were to be subdivided.
The court charged the jury that the owner of land over which a stream passes has the right to have the stream flow without diminution or alteration caused by another, and pointed out that this case differs from the usual claim of interference with a stream in that plaintiffs herein claim that a substantial part of the water in the stream had been supplied by ground water in defendant’s land, and that the heavy pumping of defendant’s well and consequent diversion of this ground water into defendant’s distribution system had caused the stream to dry up.
The court then told the jury that the burden rested upon plaintiffs to prove by a fair preponderance of credible evidence that they had sustained damage through the act of defendant in withdrawing water that had fed the stream; that if plaintiffs failed to sustain this burden the verdict would have to be in favor of defendant; that if the jury found as a fact that plaintiffs had proved their claim they would be entitled to damages ; and that all that could be awarded to plaintiffs as damages in this case would be the diminution of value of their property caused by the drying up of the stream. The court pointed out the conflict in the testimony of the expert witnesses as to whether the pumping of defendant’s well had withdrawn percolating ground water which had formerly fed the stream. He then told the jury that the testimony of an expert witness was not to be accepted or rejected at will but was to be weighed and con *92 sidered in the same way as the evidence of other witnesses, and ‘ ‘ what you believe of the experts ’ testimony is pretty much how you will have to decide this case.”
The jury returned a 10 to 2 verdict in favor of plaintiffs for $5,000. Defendant moved subsequently to set aside the verdict and for a new trial, and this motion was denied.
Defendant’s first point on appeal is that the neighbor who testified that the water table in his well had been lowered to such an extent that he could no longer use the well, had been allowed improperly to testify as an expert with regard to the soundings that he made in his well and the records he had prepared therefrom. This point presents no ground for reversal. The qualification of a witness to testify as an expert is a matter for determination by the trial court in his reasonable discretion, and when such discretion is exercised the decision is not open to review unless in deciding the question the trial court has made a serious mistake, or committed an error of law, or has abused his discretion. (Meiselman v. Crown Hgts. Hosp., 285 N. Y. 389, 398.) The trial court’s determination that this witness was qualified to take soundings in his well and to testify as to the measurements so obtained is supported by the record. Furthermore, in view of the testimony of plaintiffs’ expert witness and the admissions of defendant’s chief engineer and the ground water geologist who testified for defendant as an expert, the question of whether there was any correlation between the pumping of defendant’s well, the lowering of the water table in the other well, and the drying up of the stream was for the jury to decide as a matter of fact.
Defendant next contends that the verdict should be set aside as being against the weight of the evidence because the testimoney of defendant’s expert witnesses established that there could be no causal relation between the pumping of defendant’s well and the diminution of water in the stream. The simple answer to this contention is that the evidence created sharp questions of fact. The jury was not bound to accept as true the testimony of, defendant’s witnesses that because of the existence of an impermeable layer of earth above defendant’s well it was not pbssible that the pumping of defendant’s well had withdrawn waters which formerly fed the stream, thereby causing it to dry up. Plaintiffs’ expert testified that in his opinion such pumping had caused the stream to dry up. This testimony, and the testimony of plaintiffs’ other witnesses that this stream had flowed constantly for many years before defendant installed its pump and started to pump water from the well into its distribution system, and that it thereafter dried *93 up and remained dry, was ample to support a finding by the jury that the pumping of defendant’s well had caused the stream to dry up.
Defendant also contends that the court was in error when he charged the jury that the applicable law was the rule of “ reasonable use” or “correlative rights” since this is not a case where defendant is intercepting or withdrawing percolating water from the lands of plaintiffs. Defendant admits that the court charged the law as it was laid doAvn in the cases of Smith v. City of Brooklyn (18 App. Div. 340, 32 App. Div. 257, affd. 160 N. Y. 357) and Forbell v. City of New York (47 App. Div. 371, affd. 164 N. Y. 522) but says the facts in the instant case would clearly indicate that the rules enunciated in those cases are not applicable. It is our opinion that the facts in this case bring it squarely within the scope of Smith v. City of Brooklyn (supra). In that case, as here, plaintiff claimed that the pumping by defendant of water from wells upon its land had lowered the underground water level in its land and the surrounding land and had caused a brook and pond on plainiff’s land to dry up and remain dry and the jury found this to be so as a matter of fact. Plaintiff was successful upon the second trial, and the judgment in his favor was affirmed by the Appellate Division and the Court of Appeals.
The case of Forbell v. City of New York (supra) went further and sustained a judgment for plaintiff where plaintiff’s claim was that defendant had, by means of its wells and powerful pumps, drained the percolating waters from under plaintiff’s land, destroying his crops. However the plaintiffs in the instant case do not assert that defendant has drawn any percolating waters from beneath the surface of their land, but base their case on their riparian rights in a floAving stream.
Defendant does not contend that the rule of law established in the Smith case (supra) has since been restricted, modified or changed in any way. In the decision of the Appellate Division in that case (18 App. Div. 340), later characterized by the Court of Appeals in the Forbell case (supra, p. 527) as “ a valuable contribution to the discussion of the subject”, it was stated that defendant denied liability on the ground that it had the absolute right to consume, divert or cut off percolating waters with impunity. The court reviewed the English cases in which the rule relied upon by the defendant had been established and admitted that the decisions in this State upheld that vieAV. Hoavever, the court went on to say (18 App. Div. 340, 342-349):
“Admitting this doctrine to the extent to which these and other authorities in this State carry it, does it fit the facts of *94 the present case? It may be stated, with some degree of confidence, that no ease will be found in this State, and our research has not enabled us to find one in any other State of this country, where the right has been upheld in the owner of land to destroy a stream, a spring or well upon his neighbor’s land,, by cutting off the source of its supply, except it was done in the exercise of a legal right to improve the land or make some use of the same ip connection with the enjoyment of the land itself, for purposes of domestic use, agriculture, or mining or by structures for business carried on upon the premises. We are aware thatj the doctrine has been carried beyond this in England, but it has not yet been judicially declared here. (Chasemore v. Richards, 7 H. L. 349.) The present case, as we view it, differs radically from any reported case that we are able to find in this country. While it is true that the city owned the land upon which it placed its structure, and all of its acts were done upon its own property, it did not, however, make the erections or do the acts for the beneficial use and enjoyment of the land itself for any purpose of domestic use, agriculture, mining or manufacturing, as land was used in the cases which have arisen in this country. No one dwelt thereon or was expected to; no one used the water thereon, nor was it expected to be used in connection therewith. The sole purpose was to subordinate the use of the land to the particular purpose of a reservoir and conduit in which to gather, store and carry water to a distant place, for its benefit and profit, and for the enjoyment of strangers who have no claim or shadow of right to it as against the plaintiff. * * *
íí There remains to be considered another feature of the question raised by the record now before us. The stream which was diverted and which formed the pond was perennial. The witnesses say it had existed for fifty years to their knowledge, and, if fifty years, probably always, as streams have existed. It was fed by springs. The act of the defendant has cut off the feeders, and it no longer lives. The right to the use of a running stream is not rested upon a grant; it is jura natura. We need not discuss the rights of riparian owners in running streams, as that question is well settled. Among the rights thus established is that water may not be diverted from a running stream to the damage of a riparian owner. In the case of water already in the stream, this; right is clear and we have no difficulty. But just here arises the trouble in this case. The water had not arrived at the stream. Its destruction was complete, as its source of life was cut off. We are, therefore, to consider whether the property right: of plaintiff is in the thing, the stream, or in *95 the particles of water simply, which presently go to make it up. The struggle to maintain the principle of law applicable to percolating water as applied to the diminution of running streams, in its application to a state of facts similar to those which now confront us, has been a source of much trouble and difficulty for the English courts. * * *
1 ‘ There is certainly an inconsistency in the rule which gives to an owner of land the usufruct of a stream which exists as a right ex natura, and yet vests in another, in his search after underground water, the right to destroy the stream absolutely. There is no difference in the injury inflicted, if the stream be taken, whether it be brought about by drawing the water from the stream itself or cutting off the supply.”
In affirming this decision, the Court of Appeals said (160 N. Y. 357, 360-361):
“ The legal question of the defendant’s liability to respond in damages, in such an action, is no longer one which should be regarded as open to discussion. It is settled by the decision of the courts of this state, and it is the rule in England, that no one may divert, or obstruct, the natural flow of a stream for his own benefit, to the injury of another. (Fixley v. Clark, 35 N. Y. 520; Van Wycklem v. City of Brooklyn 118 ib. 424; Covert v. Crawford, 141 lb. 521; Chasemore v. Richards, 7 H. L. 349 and Grand Junction Canal Co. v. Shugar, L. R. [6 Ch. App.] 483.) The right to the use and enjoyment of a stream of water, running in a defined and natural channel, jure naturae, appertains to the riparian landowners. (Shury v. Piggott, 3 Bulstrode, 339; Tyler v. Wilkinson, 4 Mason C. C. 397.) In the Van Wycklen Case (supra), this same defendant, by sinking wells and pumping water into its reservoir, had caused a subsidence of the waters of a creek, by which the plaintiff operated a grist mill, and a recovery of damages was sustained. * * * All the cases hold that the water of a natural surface stream is for the benefit of all the riparian owners and that to divert, or to diminish, its flow in any way, is an interference with a natural right, which will give rise to an action for the injury sustained.
“ That the diversion and diminution of the stream were caused by arresting and collecting the underground waters, which, percolating through the earth, fed the stream, does not affect the question. When the fact was established upon the proofs that the defendant’s works and wells had caused, by this subsidence of water, a diversion of the stream’s natural flow in its channel, the injury was proved and the plaintiff’s cause of action established.”
*96 In a supplemental brief, defendant has raised the contention that the amount of water pumped by it from its well as shown by the figures received in evidence on the trial could not possibly have caused the stream to dry up, and defendant supplies a calculation intended to prove this contention. The answer to this argument is that it is a matter which should have been raised upon the trial. If that had been done its validity, including defendant’s method of computation, could have been tested and the matter submitted to the jury for its consideration. It may not be considered here for the first time on appeal.
The judgment and order should be affirmed, with $25 costs.
Hart and Groat, JJ., concur.
Judgment and order affirmed, etc.