### FORBELL v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. January 9, 1900.)

1. WATERS AND WATER COURSES—PERCOLATING WATER—RIGHT OF CITY TO DIVERT FLOW—DAMAGES.

A city, in operating its pumping station, drew to its pumps the water percolating under ground over an area of several square miles. It intended, in driving its wells and operating its pumps, to produce such result. No improvement was made on the land of the city, nor was there any intent to improve, by such water, which was to be used elsewhere. The water level in the territory thus drained was lowered several feet, which had the direct effect of destroying crops growing or which could be grown upon plaintiff's land. *Held*, that the city was liable for the damage thus sustained.

2. SAME—INJUNCTION.

The operation of the pumps should be enjoined.

Appeal from special term, Kings county. ·

Action by Benjamin F. Forbell against the city of New York. Judgment for plaintiff (56 N. Y. Supp. 790), and defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.,

William J. Carr (R. Percy Chittenden, on the brief), for appellant. Charles Coleman Miller, for respondent.

HATCH, J. The plaintiff in the present action challenged the right of the defendant to remove from his land subterranean waters which naturally remained thereon, or to divert the flow of percolating water which naturally and usually came thereto. His challenge has been supported by the court, as by its decision it is found that, as applied to the particular facts of the case, the law does not support the act as the exercise of a legal right. In Smith v. City of Brooklyn, 18 App. Div. 340, 46 N. Y. Supp. 141, this court held that the legal right did not exist in the defendant to intercept the source of a running stream, where such interception worked its destruction; that the property right in the owner of the stream was not limited to the present particles of water therein, but consisted as well in the right to the continuing flow of the stream in its usual and natural channel. Upon appeal to the court of appeals, that court affirmed this doctrine, saying, through Judge Gray:

"The right to the use and enjoyment of a stream of water running in a defined and natural channel, jure naturæ, appertains to the riparian landowners. * * * All the cases hold that the water of a natural surface

stream is for the benefit of all the riparian owners, and that to divert or to diminish its flow in any way is an interference with a natural right, which will give rise to an action for the injury sustained. That the diversion and diminution of the stream were caused by arresting and collecting the underground waters, which, percolating through the earth, fed the stream, does not affect the question. When the fact was established, upon the proofs, that the defendant's works and wells had caused, by this subsidence of water, a diversion of the stream's natural flow in its channel, the injury was proved, and the plaintiff's cause of action was established." 160 N. Y. 357, 360, 54 N. E. 787, 788.

So far, therefore, as running streams are affected by the diversion of percolating water, the law of this state declares the same to be unlawful, and in derogation of the property rights of those persons who are interested therein. The court, in the case last cited, however, did not find it necessary to determine whether the same rule would obtain in the case of percolating waters, collected for the purpose of transportation and sale, and not for any use connected with the land, as such question was not presented by the facts of the case. In the present case this is the only question involved. The court has found, and the evidence is sufficient for its support, that the operation of its pumping station by means of driven wells and pumps has had the effect of lowering the water level several feet under the lands occupied by the plaintiff, and that such result is produced solely by the said act; that the underground water on the plaintiff's land was and is indispensable to the enjoyment of the land; that the direct effect of the defendant's act was to prevent the growing of valuable crops upon the land, for which the same was peculiarly adapted. Upon these findings and others, the court awarded damages, and enjoined the defendant from operating its pumping station, subject to certain conditions looking to a condemnation of plaintiff's rights in the premises by proceedings in invitum.

The evidence given upon the trial established that the defendant has acquired title to two acres of land, and from this territory it pumps from three to ten millions of gallons of water daily. To obtain this immense quantity of water, it draws to its pumps the water percolating underground over an area of from five to eleven square miles of territory, the witnesses varying in this regard, in and to the soil of which it has no legal right, title, or interest, except as heretofore specified. The evidence tended fairly to support the conclusion that the water level in the territory thus drained was reduced from ten to fifteen feet, and was either wholly or partially destructive of the crops growing, or which could be grown, upon the plaintiff's land. It was stated by the engineer called by the defendant that the flow of the water to the pumps is caused by atmospheric pressure solely; that the pumps create a draft, and pressure of the atmosphere results, forcing the water to the pumps; that it was not drawn thereto by "suction," which, it is claimed, is an improper term to apply to the process. We are little concerned with the scientific explanation, however interesting and instructive it may be. It can matter little what the force which operates it is, so long as the undisputed fact remains that the

means used by the defendant despoils the land of the water which would naturally remain thereon, and thereby deprives the owner or occupant of its beneficial use and enjoyment. We are therefore presented with a case where the diversion is of percolating water running in no defined channel, where the works of the defendant were erected upon its land for the express purpose of obtaining such water, and where it does obtain it to the substantial damage of the plaintiff.

Under such circumstances, has the adjoining landowner a legal right to recover for the damage sustained, and the equitable right to have the operation enjoined? This is a question not yet answered by the court of last resort in this state. In the Smith Case, supra, this court announced its views by answering the question in the affirmative. Whether the discussion there had was obiter or not is now of little consequence. We have, since the argument of this case, carefully gone over the question, examined the authorities, and are unable to find any sound reason for departing from the views therein expressed.

Upon the main question, but little can profitably be added to the discussion which has been already had. But, in further examination and consideration of the argument of the learned counsel for the appellant, we are inclined to think that he labors under a misapprehension of the principle which controls and governs our conclusion. In the leading case of Acton v. Blundell, 12 Mees. & W. 324, the right to intercept the flow of percolating water was supported, for the reason that the use of the land (mining) in that case was the exercise of a legal right, and that, as the flow of the water in underground channels was obscure, uncertain, and unknown, any attempt to limit the use of the soil, so as to protect the right of the adjoining landowner therein, would not only lead to unreasonable consequences, but, from the nature of the case, it would be impracticable, if not impossible, to award relief and protect the rights of both. These reasons, and others which add no strength to defendant's position, have furnished the basis for a denial of legal interference, as between adjoining landowners, in percolating waters ever since. Both reasons most clearly fail when applied to the facts of the present case. We assert that the act of the defendant in establishing this pumping station for the purpose of drawing to itself all of the subsurface water in a given locality, situate in land which it does not own and in which it has no interest, or of such portion of the water as it chooses to take for its present or future needs, is not the exercise of a legal right, with which it became invested when it purchased the land. The doctrine is that for the interception or diversion of percolating water which comes naturally upon the land, or is diverted by reason of any improvement thereon, no liability attaches. There is no complaint made in this case for any such act. No improvement was made upon the land by the defendant, nor did it intend to improve it. No percolating water was intercepted or cut off by reason of any act which the defendant did in sinking its wells, or, if so, it resulted in no damage. The defendant intended when it sank its wells to create a condition whereby

it would draw, not alone the water upon its lands, not alone that
which would naturally flow thereto, but all or such part as the land
of adjoining proprietors contained, as its necessities required. This
is, in no true sense, the interception or diversion of "percolating
water," within the meaning of that term as used by the courts,
and it has never been used in connection with such a case until
the right here insisted upon was asserted. Indeed, the act here did
not intercept the flow of the water in the natural way, nor did it
divert it by any act of improvement upon the land. It created a
condition whereby all the water was drawn to one spot. That this
result would follow was, for all practical purposes, as well known
when the wells were driven as it was when the pumps were applied
and the conditions created. If the act is to be supported as the
exercise of a legal right, then we must be prepared to say that the
defendant may turn the area which it thus drains into a desert,
and destroy, at least for agricultural purposes, a large tract of land,
without even the pretense of improving its own. That such result
would not be in consonance with justice must be the answer of every
rational mind. We have not been able to find any adjudged case,
either before or since the opinion in the Smith Case was written,
where the doctrine has been carried to this extent, or, indeed, where
such injury could be contemplated as possible to arise between
the ordinary use of land by adjoining owners, except in this and
the cases we have before considered. The present use of the land
is for the purpose of obtaining what naturally belongs to the ad-
joining owners, and ought not to be permitted to be so far extended
as not only to despoil, but to destroy. Certainly, upon no legal or
equitable principles can such use be denominated the exercise of a
legal right. Under such conditions, the question of motive is im-
material, as the same is immaterial where a legal right exists to
make the improvement which works the injury. It may be conceded
that in the latter case the intent might be bad, and yet the right
be supported, as was the case in Phelps v. Nowlen, 72 N. Y. 40.
But therein the right was clear to dig the ditch, even though the
effect was to divert the water. There was no attempt there, as here,
to draw water from adjoining lands for the purpose of making sale
of such water, disconnected entirely from the use of the land to which
it might be devoted for any purpose of use. And, even if it were
otherwise, the doctrine of that case certainly cannot be far extended;
for in Barkley v. Wilcox, 86 N. Y. 140, the right to divert the natural
course of surface water, flowing in no defined channel, by reason
of a legitimate improvement of the land, was made to depend upon
the exercise of good faith in creating the condition. There can be
no sound distinction between the right to divert surface water flow-
ing in no defined channel and the right to divert subterranean wa-
ter; and, as you may not collect the former and discharge it in a
volume upon your neighbor's land, so you may not collect all of
the latter, and devote it either to your own or the use of another.
The objection becomes stronger where, as here, the water thus col-
lected is to be devoted to the use of persons and corporations who
have no interest in the land, either as proprietor of the part whereon

the water is collected, or as owner or proprietor of the land from which the water is drawn.

Those cases which have been reported since the Smith Case was decided by this court have not added to the strength of the defendant's position. So far as there has been expression, their tendency, we think, is to support the view which we have heretofore taken, and now take, even though they mostly involved the construction of special statutes. U. S. v. Alexander, 148 U. S. 186, 13 Sup. Ct. 529, 37 L. Ed. 415; Proprietors of Mills v. Braintree Water-Supply Co., 149 Mass. 478, 21 N. E. 761, 4 L. R. A. 272; Bailey v. Woburn, 126 Mass. 416; Wheelock v. Jacobs, 70 Vt. 162, 40 Atl. 41, 43 L. R. A. 105. Wherever the rights of adjoining landowners have been concerned, the old rule of the absence of correlative rights has been asserted. But these cases do not apply where the right sought to be exercised is not that of the use of the land, except for the specific purpose, either intentionally or necessarily, of drawing such water from an adjoining owner. We are impressed with the importance of the question which we are now deciding, as we are aware that it materially affects the city of New York, especially in the borough of Brooklyn, in connection with its source of water supply, and creates much embarrassment in the present source and expense of the future supply. But, bearing all of these questions in mind, we are not able to bring ourselves to the conclusion that the greatest necessity can work a rule of law which operates to the destruction, without compensation, of property rights of individuals, in order that this municipality may have a water supply. We can readily see why the rights of landowners must be made to yield to the necessities of this multitude of people, but we are unable to find any principle of law through which such landowner is required or compelled to sacrifice his property rights for the benefit of the multitude who require it. It seems to us that a law which works such a result would be a gross invasion of property rights, and ought not to find countenance with the courts.

For these reasons, we think the judgment should be affirmed. All concur.