Herriman Irrigation Co. v. Keel.

THE HERRIMAN IRRIGATION COMPANY, a Corporation, Appellant, v. GEORGE W. KEEL, FELICITAS KEEL, and THE BUTTERFIELD MINING COMPANY, a Corporation, Respondents.

No. 1354.   (69 Pac. 719.)

2. **Appeal: Res Judicata: When Applicable.**
   The decision of an appellate court constitutes the law of the case only as to such questions as were necessarily involved in such decision, and were presented to the court and expressly or impliedly decided.

1. **Same.**
   Where a case is reversed for insufficiency of evidence to support a material finding, and in the second trial material evidence not offered at the first trial is introduced, the decision on the first appeal is not conclusive on a second appeal.

3. **Appeal: What Questions Considered.**
   The only questions before an appellate court on an appeal are those raised by assignments of error and also presented in appellant's brief.

4. **Appeal: Findings on Conflicting Evidence.**
   Findings based on conflicting evidence, considered and weighed by the trial court in the light of a personal examination of the subject-matter in suit, will not be disturbed on appeal.[1]

5. **Waters: Underground and Percolating: Incidental Interference with: Damnum Absque Injuria.**
   Water standing in land underneath the surface, or passing through it by filtration, percolation, chemical attraction, or in undefined and unknown streams, belongs to the land, and the incidental drying up of springs caused by the escape of such waters into and out through a tunnel driven by one on his own land is *damnum absque injuria.*[2]

---

[1] Miller v. Livingston, 22 Utah 174, 61 Pac. 569; Larsen v. Onesite, 21 Utah 38, 59 Pac. 234.

[2] Crescent Min. Co. v. Silver King Min. Co., 17 Utah 444, 54 Pac. 244, 70 Am. St. Rep. 810; Irrigation Co. v. Michaelson, 21 Utah 243, 60 Pac. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687.

**6. Waters: Turning into Natural Stream: Abandonment: Diversion.**

Where one who has developed water incidentally, in digging a tunnel on his own land, turns it into a stream, he does not thereby abandon it, but may take it out again lower down the natural stream, with a proper allowance for seepage and evaporation.

**7. Same: Burden of Proof.**

Where one turns water developed from his land into a natural stream, and takes it out again lower down such stream, the burden is on him to show that he does not take out more than he is entitled to after allowing for seepage and evaporation.

(Decided July 19, 1902.)

Appeal from the Third District Court, Salt Lake County.— *Hon. H. H. Rolapp,* Judge.

Action to restrain the defendants from continuing to divert water from Butterfield creek, the use of which the plaintiff claims by right of prior appropriation. From a decree in favor of the defendants, the plaintiff appealed.

MODIFIED.

*Messrs. King, Burton & King* for appellant.

*Andrew Howat, Esq.,* for respondents.

BARTCH, J.—This action was brought to restrain the defendants from continuing to divert water from Butterfield creek, the use of which the plaintiff claims by right of prior appropriation.

It appears from the record that, about the year 1852, various persons settled upon lands where the village of Herriman is situated, and appropriated all the water of Butterfield creek for the purposes of irrigation and domestic use. Afterwards those entitled to the use of the water organized the plaintiff corporation, for the purpose of controlling its use and

25 Utah—7

distribution according to the respective rights of the share-holders; and the corporation is the owner of the water so appropriated, and represents all the parties beneficially interested in the appropriation and use thereof. All the water running in the natural stream was so used, by those persons and their successors, from the time of the first appropriation until about the year 1894, when, about two miles above the point of diversion of the plaintiff, the defendants erected a head gate in the natural channel of the creek, and diverted about one-half of the water then flowing in the stream, and from that time until the commencement of this suit the defendants have continued to divert such portion of the stream. Prior to the diversion of any water by them from the creek, the defendant company had become the owner of a number of mining claims, and to develop these claims, and for the purpose of extracting minerals therefrom, the mining company had driven two tunnels upon its own land; the one, the Queen tunnel, extending into the mountains about 2,900 feet, and the other, or Butterfield tunnel, over 8,200 feet. In the construction of these tunnels the water in dispute was developed, turned into the creek, and, after flowing in the natural channel for a considerable distance, diverted by the defendants, at their point of diversion, by means of the head gate. The plaintiff claims, and introduced evidence tending to show, that the construction of the tunnels caused a number of springs, out of which water theretofore flowed into the creek, to dry up and cease flowing, and that, except for the tunnels, the water flowing from them would flow from the springs. The defendants introduced evidence tending to show that, in the vicinity of where the springs in question are claimed to have formerly existed, springs are still flowing; that the construction of the tunnels did not have the effect of causing any springs to cease flowing; that, if any springs ceased to flow, it was the result of other causes, such as less precipitation for several successive years, the destruction of timber and under-

growth, which formerly retarded the snow from melting and retained moisture, etc.; and that the streams of water flowing out of the tunnels came from percolation and small undefined and unknown subterranean streams.     The evidence shows that water comes into the Butterfield tunnel from innumerable places beyond a point therein about 5,500 feet from the mouth thereof.     There appears to be no surface indication of any channel or water course between the springs in question and the tunnels, and the springs claimed to have been·affected are situate from nearly a mile to a mile and a half distant from the tunnels.     At the trial the court entered a decree in favor of the defendants, and the plaintiff appealed.

This case was before us on a former occasion, and we then reversed it, and remanded it for a new trial.     19 Utah 453, 57 Pac. 537, 51 L. R. A. 930.     At the former trial it was, the same as at this, decided in favor of the defendants, and the plaintiff then, same as now, was the appellant.     On this appeal, the appellant in the first instance insists that, under the "law of the case," this court should set aside the findings and decree of the trial court, and order judgment entered as prayed for in the complaint; and that the questions now herein presented were adjudicated on the former appeal, and have become *res judicata*.     The efficacy of the general rule here invoked is not to be doubted.     The rule, however, is not entirely without limitations.     It does not apply to expressions of opinions on questions the disposition of which was not necessary for the decision, or to the reasoning or illustrations in an opinion, however important in determining what was decided.     Nothing in a decision which is merely *obiter dictum* is controlled by the rule.     Nor does a decision, as to a question of fact, fall within the rule, when, upon the retrial, material evidence not offered at the first trial is introduced. So the doctrine of *res judicata* does not apply where a judgment is reversed and remanded for a new trial because material findings of fact are not supported by the proof, and when at

the second trial additional evidence is offered and admitted. But upon all questions involved in the judgment the decision of the appellate court is conclusive. This appears to be the settled law.

In Elliott, App. Proc., section 578, the author, after stating that "it is a firmly settled principle that the decisions of the appellate tribunal constitute the law of the case upon all the points in judgment," says: "It is, however, to be borne in mind that the rule does not go to the extent of foreclosing a review of all the questions discussed, for it does not, by any means, go to that length. It is only such questions as were before the court for decision, and such as were expressly or impliedly decided, that are conclusively adjudicated. The reasoning or illustrations of the court do not constitute decisions, and hence the reasoning and the illustrations, although they may be important as aids in determining what was actually decided, do not constitute the binding adjudication." In Barney v. Railroad Co., 117 U. S. 228, 6 Sup. Ct. 654, 29 L. Ed. 858, one question was whether, on a former appeal, certain matters had been determined, and had become the law of the case. In an opinion written, on that appeal, by Mr. Justice FIELD, certain expressions were made upon certain legal questions involved in the case, but not then directly before the court for determination. The decree was reversed, and the cause remanded, with directions to take further proceedings in accordance with the opinion. 113 U. S. 618, 5 Sup. Ct. 606, 28 L. Ed. 1109. The lower court, on the retrial, it seems, considered itself bound by the expressions of opinion so inadvertently made, and disposed of the case accordingly. On the second appeal, it was urged that what was stated in the opinion of the appellate court had become the law of the case. On this question, Mr. Justice FIELD, who again delivered the opinion of the court, said: "We said, however, that the grant of these additional sections might be regarded as one of quantity—an inadvertence for which

the writer of that opinion, who is also the writer of this one, is alone responsible. The statement was not at all material to the decision, which was that a deduction should have been made by reason of the intersection of the two grants, so far as the prior grant was located within the extension. We recognize the rule that what was decided in a case pending before us on appeal is not open to reconsideration in the same case, on a second appeal upon similar facts. The first decision is the law of the case, and must control its disposition; but the rule does not apply to expressions of opinion on matters, the disposition of which was not required for the decision." So, in Mattingly v. Pennie, 105 Cal. 514, 39 Pac. 200, 45 Am. St. Rep. 87, it was said: "It is settled beyond controversy that a decision of this court on appeal, as to a question of fact, does not become the law of the case. But plaintiff contends that the question thus presented of the insufficiency of the evidence to support a verdict for plaintiff was a question of law, and was the very fact in judgment on that appeal. Assuming, without deciding, that the view is correct, we are nevertheless of opinion that the point now presented is not the same as that so supposed to have been decided on the former appeal, and that we are therefore now entitled to consider it without being concluded by the former decision. We adhere to what was said on that subject in Wixson v. Devine, 80 Cal. 388, 22 Pac. 224, and will not extend the application of the doctrine of the 'law of the case' beyond the cases in which it has hitherto been held to apply." In Union School Tp. v. First Nat. Bank of Crawfordsville, 102 Ind. 464, 2 N. E. 194, it was said: "The principle that a decision on appeal governs the case throughout all its subsequent stages we fully recognize, but we do not understand it to be what appellee's counsel assert. In our judgment, a decision rendered on appeal does not conclusively determine merely incidental or collateral questions, but determines only such questions as are

presented for decision, and are decided, as essential to a just disposition of the pending appeal." Wixson v. Devine, 80 Cal. 385, 22 Pac. 224; Clark v. Hershy, 52 Ark. 473, 12 S. W. 1077; Maddox's Ex'r v. Williams, 87 Ky. 147, 7 S. W. 907; Hughes v. Railway Co., 78 Mich. 399, 44 N. W. 396; Sprague Inv. Co. v. Mouat Lumber & Inv. Co. (Colo. App.), 60 Pac. 179; Railway Co. v. Fox, 60 Neb. 531, 83 N. W. 744.

Having thus seen that a decision of an appellate court constitutes the law of the case only as to such questions of law as were involved in the judgment, and as were presented to the court and expressly or impliedly decided, it now becomes important to determine what questions were before this court and decided on the former appeal in this case. When a suit is brought, the questions to be tried must be determined by the pleadings; and all will concede that no questions can be determined by the trial court or jury except such as have been put in issue. On appeal, all questions to be determined must be raised by assignments of error, and in the appellate court only questions so raised can be presented and determined.

3   It will thus be observed that, before the court below can try and determine a question, the same must be put in issue by the pleadings, and that, before the appellate court can review the action of the trial court to determine a question, such question must be raised by an assignment of error. Not only must the question be so raised on appeal, but all the errors relied upon must, under the rules of this court, be plainly and distinctly set forth in the appellant's brief. It is a general rule of practice in this court that all errors assigned, but not insisted upon in the appellant's brief, will be disregarded, and considered as waived and as raising no question for determination. Only such questions, therefore, in any given case, as are raised by assignments of error, and presented in the appellant's brief, are before the Supreme Court for determination.

On the former appeal, in the present case, it appears from

an examination of the appellant's brief that all the questions presented and insisted upon were questions of fact, and a perusal of the opinion then delivered by Mr. Justice BASKIN will show that this court simply determined that the eleventh finding of fact, and a part of the sixth, were erroneous, and were not supported by the evidence, and that plaintiff's exceptions to them on that ground were well taken.   These were the only matters discussed and decided in that opinion, and thereupon the cause was reversed and "remanded for a new trial" generally.   It is quite clear that only questions of fact were presented and determined on the former appeal, and, as we have seen, the determination of such questions on appeal does not become *res judicata* where the judgment is reversed, and the cause remanded for a new trial generally, without any specific directions, and where, as in this case, a considerable amount of material evidence not offered at the first trial is introduced upon retrial.   Under these circumstances, mere expressions of opinion, as to the law, which were not required for the decision, can not become the law of the case, and do not preclude us from now determining the law applicable to the facts.   From the foregoing considerations, I am of the opinion that the decisive questions presented on this appeal have not, by virtue of our former decision, become *res judicata,* and we are therefore now at liberty to determine them.

The appellant insists that the evidence does not warrant the ninth finding of fact, which reads:     "That the driving of said tunnels, or either of them, did not dry up or diminish the flow of any spring or springs in Butterfield canyon, or in Tooele fork or Spring gulch, or any spring or springs flowing into Butterfield creek or any tributary thereof.   If any such springs dried up or diminished the flow, it was from other causes than said tunnels or either of them."   Upon careful examination of the testimony upon which this finding was based, I am unable to say that the proof does not support the finding.   It is shown that the springs, which, it is claimed,

have ceased to flow, are situate from nearly a mile to a mile and a half from the tunnels. Butterfield canyon extends in a direction substantially east and west, and the tunnels are located on the north side of the canyon, and extend into the mountain on that side. The timber and undergrowth which formerly retarded the melting of the snow and retained the moisture have been removed and destroyed. The country in that vicinity appears to be stratified and there is evidence tending to show that the dip of the stratification is towards the north, and that consequently, on the north side of Butterfield creek and canyon, the waters sink into the soil and rocks, and are carried by the stratification along the bedding planes in the opposite direction from Butterfield creek. The witnesses Stevenson and Doremus, experts of known ability, after explaining the topography of the country in question, each testified that in his opinion, after an examination of that section of country, lasting for a period of ten days, the springs in Spring gulch and Tooele fork, where, it is claimed, most of the springs in question are located, were not affected by either tunnel; the witness Stevenson stating that it was a physical impossibility for the springs to be dried by the tunnels. The witness Doremus also stated that he "saw nothing to indicate springs had dried." The witness Black, on this subject, testified as follows: "Lived in Butterfield canyon from '73 to '91, about a mile above mouth of Butterfield tunnel; ran sawmill for awhile; got logs from Spring gulch and Tooele fork; well acquainted with springs there; examined gulches three times since December, '95; same springs running now as during period of residence; more water now in Butterfield creek below tunnel than when I lived there." Further reference to the testimony in support of the finding is not deemed necessary, although there is much other evidence of similar import in the record. Then there is also testimony tending to show that the springs in question at one time existed, and in the opinions of several witnesses they were affected, and have

ceased flowing, because of the driving of the tunnels. Such, it appears, was the opinion of Dr. Talmage, a geologist of known ability. That, on the point here under consideration, there is a substantial conflict in the evidence is manifest from an examination of it. How, then, can this court interfere with the findings of fact in dispute? The rule has been firmly established in this jurisdiction that the appellate court will not interfere to set aside a finding of fact where there is a substantial conflict in the evidence relating thereto.

This rule applies with especial force in this instance, since the judge before whom the cause was tried not only had an opportunity to see the witnesses upon the stand, and observe their demeanor, and the frankness and apparent candor with which they made their statements, but also, accompanied by the representatives of both parties, including an expert on each side, went upon the ground, and made a personal examination of the subject-matter of the suit, and such inquiries as were likely to elicit the facts.

Judge ROLAPP, who was the trial judge, in deciding the case, as appears, among other things, said: "After hearing the evidence and arguments, I personally visited the premises, and have since given the case more than ordinary attention. . . . After a most careful consideration of that evidence, it is quite apparent that not even a vague inference can be formed from the testimony as to even the approximate location of any subterranean channel having definite or any banks, in the ordinary acceptation of that word, connecting the tunnels and the springs. Much less can a guess be ventured as to the direction of the flow of any underground stream carried in such unknown channel. It is true that a conclusion was reached by plaintiff's experts, based upon various theories, to the effect that they could account for no other cause for the drying up of these springs except the excavation of the defendants' tunnels, but the reasons offered for such conclusion were wholly unsatisfactory to my mind, and did not accord

with the physical facts observable upon the ground. The topography of the country in and around Butterfield creek shows that the stratification has a general northeasterly and southwesterly strike, and a general northwesterly dip, with occasional very decided changes and curves; in fact, the testimony and observations on the ground show that the dip of the stratified rocks east of St. James gulch [a gulch lying east of the tunnels and west of the 'Blue Springs'] is to the north, while the dip of the rocks west of St. James gulch is to the west. . . . Accepting as true the testimony relating to facts [apart from mere conclusions expressed by witnesses], coupled with the conditions found both inside and outside of the tunnels, and the stratifications of the rocks between the tunnels and the springs, and the significant existence of several running springs situate above the tunnels, and at various points between the tunnels and the 'Blue Springs,' and the surroundings and appearances of the plaintiff's dry springs themselves, one can not honestly come to a different conclusion than that the waters issuing from the defendants' tunnels are percolating waters only." As to the causes which may have led to the drying up of springs and the effect of the tunnels therewith, the judge said: "I think the testimony would as fully warrant a conclusion that it was produced by the want of normal rainfall in recent years, by the removal of timber from the watershed, and the herding of large flocks of sheep thereon, and various other causes referred to in the testimony. I think that the only reasonable conclusion to be reached from the testimony in this case is that the waters formed in defendants' tunnels are percolating and seepage waters, having no connection whatever with plaintiff's springs, and that the same is true as to waters feeding or having fed plaintiff's springs mentioned in this suit."

It will thus be noticed that, after hearing all the testimony, and after a personal inspection of the premises, the trial judge was firmly convinced that the tunnels did not affect

the springs; and I can perceive no ground upon which to set aside the finding here under consideration.

In Leonard v. Shatzer, 11 Mont. 422, 28 Pac. 457, the main question was whether or not the water of a spring which had been interfered with by the defendant, in its natural flow, reached a certain creek, the waters of which had been appropriated and used by the plaintiff. The trial court, upon a substantial conflict of the evidence, and after a personal inspection of the premises, found the fact upon which the question depended in favor of the defendant, and, on appeal, the Supreme Court said: "The court below heard the evidence, and personally examined the premises. This is just such a case in which the Supreme Court will not disturb the finding." This court, in Miller v. Livingston, 22 Utah 174, 61 Pac. 569, held: "On an appeal of an equitable action, the appellate court will not disturb the findings and decree of the trial court, which had the opportunity of observing the manner and bearing of the witnesses while testifying, in the absence of apparent oversight or mistake." So, in Larsen v. Onesite, 21 Utah 38, 59 Pac. 234, this court, speaking through Mr. Justice MINER, said: "The trial court had the advantage of seeing the witnesses, of hearing their testimony, and observing their demeanor on the witness stand, and was therefore better qualified to judge of their candor and truthfulness than those not placed in the same position. Under such circumstances, this court will not disturb the findings and judgment unless they are found to be so manifestly erroneous as to clearly demonstrate some oversight or mistake, on the part of the trial court, which materially affected the substantial rights of the appellants." In Dwyer v. Manufacturing Co., 14 Utah 339, 47 Pac. 311, it was said: "The rule is well settled in this State that where a case is tried in a court sitting as a court of chancery, and the evidence is conflicting, the findings of fact will be conclusive in the appellate court, unless they are so manifestly against the weight of the evidence as to demon-

strate some oversight or mistake." McKay v. Farr, 15 Utah 261, 49 Pac. 649; Watson v. Mayberry, 15 Utah 265, 49 Pac. 479; Klopenstine v. Hays, 20 Utah 45, 57 Pac. 712; Whitesides v. Green, 13 Utah 341, 44 Pac. 1032, 57 Am. St. Rep. 740; Dooly Block v. Salt Lake Rapid Transit Co., 9 Utah 31, 33 Pac. 229, 24 L. R. A. 610.

If, however, notwithstanding the evidence in support of the finding, it were admitted that it was unwarranted, still such admission could not avail the appellant, as will be observed upon further consideration of the facts and of the law applicable to them. This is so because the court further found: "That the waters that came into said tunnels during the prosecution of the work therein, and that have since and that now come into them, are waters percolating from the surface into the rocks, and through the cracks, fissures, and seams in said rocks, till they find an outlet into the tunnels through innumerable small spaces, through which the waters flow and drip into said tunnels. At no time before or during the making of said tunnels, or since, did any of the waters coming into said tunnels flow underground in streams that were known to exist, or that could be discovered, or that had well-defined channels with beds and banks; but said waters, before the making of said tunnels, were caused by rains or melting snows entering the surface of the ground and percolating through the rocks, where they either remained stationary, or moved in the rocks through the small cracks, fissures, and seams therein, and in courses and directions unknown and that were not then and are not now visible to observation; and their existence and course is only a matter of theory and speculation."

It is true, the appellant also insists that the evidence is insufficient to support this finding, but upon thorough examination, and without referring to the testimony in detail, on this point, I am of the opinion that the proof amply warrants the finding. The evidence absolutely fails to show

that any known and well-defined subterranean streams connected the springs with either of the tunnels.     On the contrary, the proof is, as found by the court, that the water flows into the tunnels through innumerable small spaces, through small cracks, fissures, and seams in the rocks, and that it is not water flowing underground in streams known to exist, or that could be discovered or observed, or that had well-defined channels with beds and banks, but water the existence and course of which was a matter of theory and speculation. There is no evidence whatever showing that any one, before the driving of the tunnels, knew how the water existed in that mountain—whether it was percolating through soil or rocks, running in streams, or was motionless.     Its movements were unknown and incomprehensible.     There were no surface indications of channels or streams, or of any body of water, where the tunnels were located.     Not until the tunnels cut the water-bearing strata did any person, so far as shown in evidence, pretend to know that the water existed there in streams, and that those streams supplied springs a mile and a half distant. Previous to that time, the water and its movements and courses, and even its existence at that place, were as hidden to mankind as the metallic oxides which also enter into the composition of the earth.     Nor were the tunnels driven for the purpose of developing a stream of water, or with any malice toward the appropriators of the surface stream.     They were driven as a mining venture in the hope of finding ore.     This was a legitimate enterprise, in which the owner of the land had the right to engage, and the water which he found, in digging the tunnels, where no known or defined streams existed, belongs to him as much as does the land itself; and this, even if thus, unexpectedly, in the nature of things, he gains an advantage over his neighbor.     Such water, so hidden in the bowels of the earth, belongs to the owner of the soil, and he has the right to dig for it upon his own land and appropriate it and use it if he chooses to do so; and if thereby a loss re-

sults to his neighbor, it is *damnum absque injuria*. Such right exists in the owner because, by the general consent of mankind, which is inferred from the very nature of the right, every owner of land is entitled to the natural advantages belonging to it. Water standing in the land underneath the surface, or passing through it, or into it, by filtration, percolation, chemical attraction, or in undefined and unknown streams, is such an advantage, which the owner of the land is left to enjoy. The law of surface streams does not apply to such water. If it were otherwise, no man would be safe in operating a mine, or even in digging a well, upon his land, for, by so doing, he might interfere with percolation, or cut an undefined stream hidden from observation, and thereby diminish or stop the flow of his neighbor's spring, and render himself liable in damages, however innocently the work might have been performed. The sequence would be the hindrance or prevention of improvements and progress. Where streams of water appear upon the surface, or in well-defined and known subsurface channels havings beds and banks, there the owners of the soil over or through which they pass are bound to take notice of the rights of all others to the water; but, as to water of the nature of that developed by the tunnels in question in this case, the law is well settled that it belongs to the owner of the land; and where, as here, springs appear to exist, which flow into a surface stream, and they are not shown to be supplied by known or defined streams, the presumption is that they are formed by ordinary percolation. Such appears to be the settled law both in England and in this country.

In Cooley, Torts (2 Ed.), pp. 689, 690, the author says: "If one by an excavation on his own land draws off the subterranean waters from the land of his neighbor to the prejudice of the latter, no action will lie for the consequent damage. This is fully settled in England by the leading case of Acton v. Blundell, 12 Mees. & W. 324, and in a later case it is decided that prescriptive rights can not be gained, in subterra-

neous waters, which will preclude such excavations on adjoining grounds as may draw them off.   These decisions have been generally followed in this country, and it may be considered settled law that, if the well dug by one man ruins the well or spring of his neighbor by drawing off its water, it is *damnum absque injuria.*   Probably, if the subterraneous water were a stream flowing in a well-known course it would be different, and one through whose land it flowed would be protected against its being drawn away from him.   But one claiming rights in such a stream would be under the necessity of proving its existence and tracing it—not an easy task in any case." So, in Gould, Waters, section 280, it is said:   "Water percolating through the ground beneath the surface, either without a definite channel or in courses which are unknown and unascertainable, belongs to the realty in which it is found.   The rule that a man may freely and absolutely use his property so long as he does not directly invade that of his neighbor, or consequentially injure his clearly defined rights, is applicable to the interruption of subsurface supplies of water or of a stream; and the damage resulting therefrom is not the subject of legal redress.   The landowner may, therefore, make a ditch to drain his land, or dig a well thereon, or open and work a quarry upon it, or otherwise change its natural condition, although by so doing he interrupts the underground sources of a spring or well on his neighbor's land."   In Kin. Irr., section 49, the author says:   "Percolating waters are those which pass through the ground beneath the surface without definite channels, although the same rules of law govern those which have definite channels but the course of which is unknown and unascertainable.   Where there is nothing to show that the waters of a spring or well are supplied by any defined flowing stream, the presumption will be that they have their source in the ordinary percolations of water through the soil.   Percolating waters, and those whose sources are unknown, belong to the realty in which it is found."

This court in Crescent Min. Co. v. Silver King Min. Co., 17 Utah 444, 54 Pac. 244, 70 Am. St. Rep. 810, where, as here, water was developed by driving a tunnel for mining purposes, and after flowing from the tunnel was claimed by the plaintiff, speaking through Mr. Justice MINER, said: "The waters issuing from the artificial tunnel into the lake are found to be underground, percolating waters from the mining claim of the defendant, and not waters naturally flowing in a stream with a well-defined channel, banks, and course. Under such a state of facts, the law seems to be well settled that water percolating through the soil is not, and can not be, distinguished from the soil itself. The owner of the soil is entitled to the waters percolating through it, and such water is not subject to appropriation. The ordinary rules of law applying to the appropriation of surface streams do not apply to percolating and subterranean streams with undefined and unknown courses and banks." So, in Irrigation Co. v. Michaelson, 21 Utah 248, 60 Pac. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687, it was said: "Water commingling with the ground or flowing through it by filtration or percolation, or by chemical attraction, is but a component part of the earth, and has no characteristic of ownership distinct from the land itself. In the eye of the law, water so commingled and flowing, or motionless, underneath the surface, is not the subject of ownership apart and distinct from the soil. If, however, subsurface streams of water flow in clearly defined channels, it is otherwise; for then the rules of law applicable to surface streams and waters apply." The Supreme Court of Pennsylvania in Haldeman v. Bruckhardt, 45 Pa. 514, 84 Am. Dec. 511, says: "A surface stream can not be diverted without knowledge that the diversion will affect a lower proprietor. Not so with an unknown subterraneous percolation or stream. One can hardly have rights upon another's land which are imperceptible—of which neither himself nor that other can have any knowledge. No such right can be supposed to have been

taken into consideration when either the upper or lower tract was purchased. The purchaser of lands on which there are unknown subsurface currents must buy in ignorance of any obstacle to the full enjoyment of his purchase indefinitely downwards, and the purchaser of lands on which a spring rises, ignorant whence and how the water comes, can not bargain for any right to a secret flow of water in another's land. It would seem, therefore, most unreasonable that the latter should have a right to prevent his neighbor from enjoying his own land in the ordinary way either by digging wells, cellars, drains, or by quarrying and mining." Then, after reviewing authorities, the court further says: "There are known streams to which, if the lower proprietor has any rights, they are perceptible, and require no subsurface exploration before their course can be defined. We are not, however, to be understood as intimating that an owner may maliciously or negligently divert even an unknown subterranean stream to the damage of a lower proprietor. But in the enjoyment of his land he may cut drains or mine or quarry, though in so doing he interfere with the flowage of water in hidden, unknown, underground channels." In Frazier v. Brown, 12 Ohio St. 294, it was observed: "The law can not properly limit the ordinarily absolute dominion of the owner of the soil, in respect to things concealed and hidden in the bowels of the earth, nor recognize an adjoining proprietor as having claims upon, or rights in, a thing passing under the surface of his neighbor's land, the existence of which was first revealed by the very act which would constitute the subject-matter of his complaint." So, in Ocean Grove Camp Meeting Ass'n v. Asbury Park Com'rs, 40 N. J. Eq. 447, 3 Atl. 168, it was said: "The courts all proceed upon the ground that waters thus used and diverted are waters which percolate through the earth, and are not distinguished by any certain and well-defined stream, and, consequently, are the absolute property of the owner of the fee as completely as are the ground, stones, minerals, or

25 Utah—8

other matter, to any depth whatever beneath the surface. The one is just as much the subject of use, sale, or diversion, as the other." Washb. Easem. (4 Ed.), p. 505, par. 2; Kin. Irr., sec. 48; Gould, Waters, secs. 281, 282; Acton v. Blundell, 12 Mees. & W. 324; Hanson v. McCue, 42 Cal. 303, 10 Am. Rep. 299; Taylor v. Welch, 6 Or. 199; Williams v. Ladew, 161 Pa. 283, 29 Atl. 54, 41 Am. St. Rep. 891; Roath v. Driscoll, 20 Conn. 533, 52 Am. Dec. 352; Wheatley v. Baugh, 25 Pa. 528, 64 Am. Dec. 721; Trustees, etc., of Village of Delhi v. Youmans, 50 Barb. 316; Village of Delhi v. Youmans, 45 N. Y. 362, 6 Am. Rep. 100; Chatfield v. Wilson, 28 Vt. 49; Chase v. Silverstone, 62 Me. 175, 16 Am. Rep. 419; Mosier v. Caldwell, 7 Nev. 363; Metcalf v. Nelson (S. D.), 65 N. W. 911, 59 Am. St. Rep. 746; Deadwood Cent. R. Co. v. Parker (S. D.), 86 N. W. 619.

The appellant further contends that the respondents abandoned the water flowing from the tunnels, by turning or permitting it to flow into Butterfield creek, and that, therefore, it was subject to appropriation the same as unappropriated water of a surface stream. On this point, the court found that, "in turning the waters of the Queen and Butterfield tunnels into Butterfield creek, the Butterfield Mining Company did not intend to abandon the same or the use thereof, but intended to take the waters from the creek at some point further down, and to apply and use the same, before reaching the creek, for the purpose of milling its ores, when needed for that purpose." Counsel for appellant insist that the evidence is insufficient to support this finding, but, from an examination of the testimony, I think the finding was justified. It is evident that there was no intention on the part of the owners to abandon the water, and no adverse title has been acquired under the statute of limitations or by prescription. As we have seen, the respondents, who were the owners of the land, were also the owners of the water, and they had the right to use it or dispose of it in any legitimate way they saw

fit. For the purpose of applying it to some proper use, the owners had, under the circumstances appearing in evidence, the right to turn it into the natural channel of Butterfield creek, and, after permitting it to flow therein for some distance, had the right to divert it again from such channel, if by so doing they did not divert more water, after making due allowance for evaporation and seepage, than belonged to them, and did not interfere with any rights of prior appropriators of the waters naturally flowing in the said channel.

There appears to be nothing in the record which would warrant the position that the respondents were diverting more water than belonged to them, or that they unlawfully interfered with the rights of any prior appropriator. The mere turning of the water in the natural stream was not an abandonment of it, nor did such act prevent the owners from again claiming it. The burden, however, is upon him who turns water into a natural stream to show that he has not taken more out of it than belonged to him. This, according to the findings, and which, I think, are supported by the proof, was shown. Butte Canal & Ditch Co. v. Vaughan, 11 Cal. 143, 70 Am. Dec. 769; Wilcox v. Hausch, 64 Cal. 461, 3 Pac. 108.

Very close scrutiny and careful consideration reveal no prejudicial error in this record, and I am of the opinion that the judgment ought to be affirmed.

MINER, C. J. (concurring).—It appears that the inhabitants of Herriman are an agricultural people, and for many years have been dependent upon the waters flowing from Butterfield creek, for the purposes of irrigation and culinary purposes. To this stream, and to the waters of the springs that have flowed into it, they have established their right. Whenever such right is established in the first appropriator of water, it should be protected by the courts.

The testimony taken in this case is conflicting, contra-

dictory, and not altogether satisfactory; yet to my mind it tends to show that, prior to the construction of the defendants' tunnels, large quantities of water did flow from plaintiff's springs into Butterfield creek. After the construction of said tunnels, this flow of water was greatly diminished, and some of the springs dried up. It also appears that small underground water courses, seams, or channels and fissures in the rocks, through which water had once run that fed some of plaintiff's springs that flowed into the creek, are still visible. These underground watercourses that fed the plaintiff's springs prior to the construction of the defendants' tunnels, shown, in some instances, to be well defined, were cut by the defendants' tunnels and considerable water that formerly fed the springs was carried through them into the stream below, and was thereafter appropriated and used by the defendants to the injury of plaintiff, and the water accustomed to flow from the springs to the creek thereby diverted. It also appears that considerable water flowing out of the mouths of the tunnels is seepage water that has no connection with plaintiff's springs, and to which the plaintiff can lay no claim.

While it is extremely difficult to determine, from the evidence, the actual amount of water diverted by the defendants from the springs, yet it is quite manifest from the facts and circumstances shown that about one-half of the water flowing out of the tunnels was diverted from the plaintiff's springs, in the manner aforesaid, by the construction of the tunnels, and this caused many of them to dry up, and impaired the flow of waters from others. It appears that there were 106.64 cubic feet of water per minute running into the creek at the dividing gate below the mouth of the tunnel. There was turned into the creek from both tunnels 74.19 cubic feet of water per minute, and there was taken out by defendant Keel, at the point of diversion, 53.34 cubic feet per minute. This amount would vary according to the seasons; seventeen per cent was allowed by the trial court for seepage and evapora-

tion, although not over eight per cent is shown to be lost in this way. The court allowed the defendants to take eighty-three per cent of water flowing into the creek from said tunnels, making a deduction of seventeen per cent for seepage and evaporation, thus allowing the defendants practically all the water flowing out from the mouth of the tunnels. After considering all of the testimony, I have come to the conclusion that the amount of the water allowed to the defendants should be reduced to fifty per cent of the water flowing into the creek from the tunnels; that only eight per cent, instead of seventeen per cent should be allowed for seepage and evaporation, and that the findings and decree should be modified to the extent of allowing the defendants fifty per cent of the water flowing into Butterfield creek from the tunnels, after deducting eight per cent for seepage and evaporation while it is passing to the point of diversion at the defendants' dam—the same to be diverted as provided in the decree and findings. The costs should be equally divided. In other respects, I concur in the opinion of Mr. Justice BARTCH.

It is ordered that the cause be remanded, and the court below be hereby directed to modify the decree so as to award to the defendant only fifty per cent of the water flowing from the defendant's said tunnel into Butterfield creek, less eight per cent for seepage and evaporation while the water is passing to the point of diversion, and that the costs be equally divided between the parties.

BASKIN, J.—This case was before us on a former appeal, and the decree was reversed and the case remanded for a new trial. 19 Utah 453, 57 Pac. 537, 51 L. R. A. 930.

The following facts, disclosed by the record, are not controverted, to-wit: "That in or about the year 1852 various settlers upon the lands in and around what is known as the village or settlement of Herriman, in this county, and the

heads of families, appropriated for beneficial use in irrigating lands, and for domestic and culinary purposes, all the waters then flowing in Butterfield creek at the point of diversion (which is about two miles above the village or settlement of Herriman), and the land upon which the water was used; and they, and their successors in occupation and interest, have ever since used all the waters flowing in said creek for the irrigation of said land, and for domestic and culinary purposes, except such waters as have been taken out by defendants, under claim of right so to do, during and since the year 1894, which right is contested by plaintiff. That the persons entitled to the use of the waters of said creek, under the appropriation made by the settlers in 1852, organized the plaintiff corporation for the purpose of controlling the use and distribution of said waters according to the respective rights of the incorporators and shareholders, and conveyed to it the said waters for such purposes, and the plaintiff corporation is the owner of, and represents all parties beneficially interested in the appropriation of, said waters, and the use thereof under the apropriation made in 1852." That the defendants, in the prosecution of their mining business, and for the purpose of reaching and developing ore bodies believed to exist under the surface of the ground, in 1892 commenced to drive the Butterfield and Queen tunnels into the mountain lying to the north of Butterfield creek, and have extended each of them several thousand feet into the mountain; that in driving said tunnels the waters thereby developed were conveyed into Butterfield creek at a point opposite the Butterfield tunnel, several miles up the creek from the plaintiff's point of diversion. That the defendants, other than the Butterfield Mining Company, in and since 1892 fenced and have occupied about 2,800 acres of land situated several miles below the point at which the water from the tunnels flows into Butterfield creek, and claim to have acquired from the defendant company the waters flowing from the tunnels to irrigate and reclaim said land for farming

and other purposes, and have constructed a head gate in the creek two or more miles below where the waters of the tunnels enter the creek, and, by means of a ditch leading from the head gate to said land, claim the right to conduct through the ditch, onto said lands, for the purposes mentioned, the same quantity of water as is discharged from the tunnels into the creek; that the defendant company owns the land where the waters of the tunnels are discharged into the creek, and the lands through which the creek runs for a distance of one mile below the point of discharging, and that from thence for about one mile it runs either over government lands or lands owned by other parties not connected with the plaintiff, and who make no objection to the use of the channel of the creek to carry the waters flowing from the tunnels. The plaintiff claims the right to divert, at the point of diversion before mentioned, all of the water of Butterfield creek, and seeks to enjoin the defendants from continuing to divert any portion of the same; and the defendants, in the cross complaint, claim the right to divert from the creek a quantity of water equal to that which flows into the creek from said tunnels, and pray that the respective rights of the parties, in the waters of said creek, may be determined and settled.

On the previous trial the defendants were awarded eighty-three per cent of the water which flows from the tunnels, less seventeen per cent on account of seepage and evaporation. On the second trial the court below found "that the driving of said tunnels, or either of them, did not dry up or diminish the flow of any spring or springs in Butterfield canyon, or in Tooele fork or Spring gulch, or any spring or springs flowing into Butterfield creek, or any tributary thereof. If any such springs died up or diminished the flow, it was from other causes than said tunnels, or either of them" —and decreed "that the plaintiff is entitled to all the waters naturally flowing into Butterfield creek, in Butterfield canyon, Salt Lake county, Utah, and to divert the same therefrom, not

including, however, the waters flowing from the Queen and Butterfield tunnels in said creek; and that the Butterfield Mining Company is entitled to all the waters issuing from the Queen and Butterfield tunnels in said canyon, and its right and title thereto are hereby confirmed in said Butterfield Mining Company against said plaintiff."

While there was testimony which tends to support said finding, it is clearly against the preponderance of the evidence. It is shown, by an overwhelming preponderance of the evidence, that many of the springs which for more than forty years had continuously fed Butterfield creek ceased to flow while the defendants' tunnels were being driven into the mountain, and have since been dried up. A. F. Doremus, an expert engineer, and a witness for the defendants, testified that he was unable to account for the drying up of springs shortly after the Butterfield tunnel was run, that, if springs dried up shortly after the tunnel was run, he would look to the tunnel for the reason of their drying up; but that he did not see how the tunnel could affect springs in Spring gulch or Tooele fork, but did see how it could affect those near the tunnel, and thought it might dry them up, and thought it possible that the tunnel dried springs on the road about a quarter of a mile above the mouth of the tunnel. Professor James E. Talmage, an expert called by the plaintiff, testified that "the streams coming into the tunnel vary in size, coming through cracks and fissures which the water has worn away, and they can be traced for some distance. From the fact revealed from observation, and from the statement that from 1852 to 1893 the springs which are now dry flowed continuously without appreciable variation, and in 1893 the tunnel encountered water which flowed out of the tunnel, and more water was encountered, as the tunnel was constructed until 1895, when all the springs dried up, I would say the sources of the springs had been tapped, and their water passed out of the tunnel." E. S. Hinckley, an expert witness called by the plaintiff, testi-

fied as follows: "In my opinion, taking into account the conditions—the former existence of the springs, their continuous flow from 1852 until tunnel was driven, the fact that they immediately stopped flowing when water was encountered in the tunnel—the driving of the tunnel was the cause of the drying up of the springs."

From the fact that a number of springs which, prior to the time when the tunnels were driven, had continuously flowed for so many years, dried up as soon as the tunnels were driven into the mountains, the conclusion is irresistible that the tunnels cut the underground channels through which the springs were supplied, and the waters which had previously flowed from the springs into Butterfield creek were thereby drawn into the tunnels, and were conveyed through the tunnels into the creek at a point different from those at which these waters had formerly entered said stream. This court so held on the former appeal. The foregoing facts were shown by the record on the previous appeal, and upon those facts this court decided "that the defendant company did not acquire a right to any of the water flowing from said tunnels except such as was developed by percolation, and that the plaintiff retains the right to all the water flowing in the natural channel of Butterfield creek, diminished only to the extent of the increase of the quantity of water which naturally flowed in the channel of Butterfield creek before said tunnels were run and said springs were dried up," and on those grounds reversed the former decree, but remanded the cause only because the evidence failed to show the amount of such increase.

From the nature of the case, the exact amount of water which the tunnels draw from the springs, or which originates from other sources, can not be established by evidence; it is, therefore, only necessary to show the approximate amount. It is clear from the evidence that at least one-half of the water which flows from the tunnels into Butterfield creek is drawn from the underground channels of the springs which were

dried up. As the controlling facts established by the evidence introduced at the second trial are the same as those established by the evidence on the previous trial, and the questions decided on the former appeal were presented by the record, and were, as they are in the present instance, necessary to the determination of the case, said decision is decisive, for it is a firmly settled principle that the decisions of appellate tribunals constitute the law of the case upon all points, presented by the record, involving the merits, and can not be reviewed on a second appeal.

The peculiar facts in this case are materially different from the facts upon which any other decision of this court, in respect to water rights, is based, and the principles governing the same are entirely different. No authorities were cited in support of the former decision in this case. It is sustained by the following cases: Smith v. City of Brooklyn, 46 N. Y. Supp. 141, affirmed in 160 N. Y. 357, 54 N. E. 787, 45 L. R. A. 664; Forbell v. City of New York, 56 N. Y. Supp. 790, affirmed in 61 N. Y. Supp. 1005; Smith v. Adams, 6 Paige 435. It appears in the case of Smith v. City of Brooklyn, supra, that there was on plaintiff's farm a stream of water running in a well-defined channel fed by springs and from other sources; that the stream many years ago had been dammed, forming a pond, and that both had been in existence for more than fifty years; that the plaintiff used the pond for boat building and obtaining ice, and it was of considerable value for those purposes. The defendant, for the purpose of furnishing the city of Brooklyn with a water supply, constructed an aqueduct for the purpose of conducting the water from a reservoir which was filled by means of wells and pumps upon its own lands, situated at a distance of 2,400 feet from plaintiff's pond and spring, and the waters which fed the springs supplying water for the plaintiff's pond were thereby diverted, and the stream and pond dried up. The court, it appears, affirmed the plaintiff's

judgment for damages. 160 N. Y. 357, 54 N. E. 787, 45 L. R. A. 664. The points decided in the case are stated in the syllabi as follows: "If a city, by the operation of a water system consisting of wells and pumps, on its own lands, drains the contiguous territory, and thus diverts and diminishes the flow of water in a natural surface stream on the land of another, it is answerable in damages, under the rule that no one may divert or obstruct the natural flow of a stream, for his own benefit, to the injury of another. The water of a natural surface stream is for the benefit of all the riparian owners; and to divert or diminish its flow in any way, including an interception of underground waters, is an interference with a natural right, which will give rise to an action for the injury sustained. Whatever may be the rule with respect to the right of a landowner to use the water percolating through the earth, and thereby to affect the sources of wells or springs upon his neighbor's land, he may not divert and diminish the natural flow of a surface stream by preventing its usual and natural supply, or by causing, through suction or other methods, a subsidence of its waters." When the case was before the Supreme Court (46 N. Y. Supp.), in addition to the foregoing points, it was held: "The right of an owner of land to divert or consume percolating water does not extend to authorizing the destruction of a stream, spring, or well by cutting off its source of supply, when the acts causing such result are not done for the beneficial use and enjoyment for any purpose of the land itself, whereon they are done, but for the sole purpose of gathering water by pumps, as well as by natural means, to be carried to a distant place for the use of strangers having no right to the water, as against the owners of the neighboring lands." This was sustained in 61 N. Y. Supp. 1005, and 56 N. Y. Supp. 790. In the latter case, SMITH, J., in the opinion, said: "Previous to the decision of the appellate division of the Supreme Court in the Second judicial department in the case of Smith v. City of Brooklyn, 18 App. Div.

340, 46 N. Y. Supp. 141, the tendency of the decisions of the courts of this State was against the contention of the plaintiff in this case, and in favor of the proposition that an action would not lie against the owner of the land who intercepted or diverted underground currents of water to the injury of another. In the Smith case, the operation of a pumping station lowered the spring level of the surrounding country, and dried up a stream and pond belonging to the plaintiff. The court held the city liable for damages. The court, in its decision, distinguished the case from other cases previously decided in this State, on the ground that in the case at bar the cutting off of the source of supply of the plaintiff's stream and pond was not done, in the exercise of the legal right of the defendant, to improve its land, or in connection with the enjoyment of the land itself, but for the sole purpose of gathering and conveying the water to a distant place for the use of the inhabitants of the city. The reasoning of the court in the case so appeals to a sound judgment and keen moral sense as to be unanswerable." There is no material difference in the facts involved, and the principle applied, in the case of Smith v. City of Brooklyn, and the facts involved, and the principle applicable thereto, in this case.

The defendant company's business was mining, and not farming, and the purpose in running the tunnels was the development of its mines. It has not used any of the water on its own land for farming purposes, nor does it intend to do so; for it is alleged in the cross complaint filed by it and its codefendants that its codefendants have acquired from it the waters flowing from the tunnels, to irrigate and reclaim their lands for cultivation. It is a matter of common knowledge, and the courts will take notice of the facts without proof, that irrigation is the life of agriculture in this State; that the high mountains are cut by deep canyons, through which flow streams of water which are supplied from springs issuing from the mountains; that these springs are usually fed from sub-

surface channels or fissures in the rocks; that tunnels driven at a great depth and distance into the mountains cut these channels or fissures, and dry up or diminish the flow, not only of springs near the tunnels, but of those remotely situated; that along the course of these streams, and in the valleys into which they flow, a majority of the inhabitants of the State reside; that towns have sprung up, and large areas of land have been reclaimed and brought to a high state of cultivation, by irrigation from said streams. If it were established that the owners of tunnels which divert from their natural flow the waters which supply these streams have the lawful right to divert from the streams, and dispose of, such water after it has passed from the lands of such owners, most of the irrigating streams of the State can be diminished, to the irreparable damage of the inhabitants whose agricultural interests depend upon irrigating streams. From the commonly known fact that tunnels like the ones in question dry up springs in their vicinity, it must be presumed that the defendant company was aware, when the tunnels in question were started by it, that the springs which fed the Butterfield creek were liable to be dried up, or their flow materially diminished, thereby, to the great damage of the inhabitants of Herriman. From that commonly known fact, the effect of running the tunnels in question was not less apparent, when they were started, than was the effect of the acts of Brooklyn city from the facts in the case of Smith v. City of Brooklyn, supra. The question under consideration has not been decided by this court except in the case at bar. In neither of the two cases (Irrigation Co. v. Michaelson, 21 Utah 249, 60 Pac. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687, and Crescent Min. Co. v. Silver King Min. Co., 17 Utah 444, 54 Pac. 244, 70 Am. St. Rep. 810), were the waters of a natural stream, which had previously been appropriated, diverted, or the natural springs, by which the streams were fed, dried up.

I, therefore, concur in the order directing the court below to modify the decree.